Filed 7/2/14  In re Ivan Z. CA1/5

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| In re Ivan Z., a Person Coming Under the Juvenile Court Law. | |
| NAPA COUNTY HEALTH AND HUMAN SERVICES AGENCY,  Plaintiff and Respondent,  v.  Teresa S. et al.,  Defendants and Appellants. | A140042  (Napa County Super. Ct. No. JV16892) |

The juvenile court terminated the parental rights of Teresa S. (mother) and R.Z. (father) with respect to their son, Ivan Z., who was not yet three years old.  (Welf. & Inst. Code, § 366.26.)[1]  Father and mother appeal from that order, arguing (1) that both the court and the Napa County Health and Human Services Agency (Agency) failed in their duty, under section 361.3, to give preference to relative placement; and (2) that the court erred in determining the beneficial relationship exception inapplicable.  We affirm.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

*Section 300 Petition and Detention Report*

In August 2011, when Ivan was 10 months old, the Agency filed a juvenile dependency petition, which alleged that Ivan had suffered, or was at substantial risk of

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

1

suffering, serious physical harm (§ 300, subd. (b)) as a result of his parents' domestic violence and substance abuse. Specifically, it was alleged that, on August 18, 2011, father had hit mother in the head with a beer bottle and had shoved her while she was holding Ivan. The petition also alleged that mother was frequently intoxicated while caring for Ivan and that father had been diagnosed with bipolar disorder but had been self-medicating with marijuana instead of taking his psychotropic medication. At the detention hearing, father was declared Ivan's presumed father and Ivan was detained in foster care.

*Jurisdiction Report and Determination*

The jurisdiction report indicated that both mother and father admitted an extensive history of domestic violence in Ivan's presence. Mother also admitted she had a drinking problem. Mother had, however, recently obtained a restraining order against father. At the jurisdiction hearing, both parents submitted on the allegations. Accordingly, the court sustained the petition and adjudged Ivan "a person as described under [section 300, subdivision (b)]."

*Disposition Report and Hearing*

The disposition report, filed by the Agency on November 1, 2011, indicated that mother was sober and engaging in substance abuse treatment services. She also reported a desire to end her relationship with father and independently support herself and Ivan. To that end, she was living in a shelter and had begun working. Father had not participated in his disposition interview, as he was incarcerated, but had indicated a willingness to begin psychotropic medication and stop smoking marijuana.

Ivan was reported to be developmentally on target and doing well in foster care. With respect to visitation, it was observed that "mother loves and cares for [Ivan] and demonstrates developmentally appropriate parenting." It was also observed that "[Ivan] seems to be excited every time he sees his mom," and that father was loving and appropriate. However, since September 23, 2011, father had missed 10 visits.

The social worker also wrote: "Since the beginning of the case, a paternal great aunt, [Debbie Z.], and a paternal aunt, [A.Z.], have stepped forward to take care of [Ivan].

2

The [Agency] is currently assessing the home of [Debbie Z.] in Napa. [A.Z.] . . . was determined to be not appropriate at this point because she resides in Los Angeles and will be moving to Sacramento, which is far in distance for [an] 11 month old minor to travel weekly to comply with his reunification services. The mother had stated that her sister . . . would like to be assessed for possible relative placement. The undersigned has left multiple messages with [the maternal aunt and] is waiting to hear back from her . . . . "

At the uncontested disposition hearing, on November 10, 2011, the court declared Ivan a dependent of the court and found that removal from mother's and father's custody was required. With respect to reunification, the court ordered mother to participate in counseling or therapy related to domestic violence and substance abuse, complete a drug and alcohol assessment and comply with all recommendations, attend a minimum of three Narcotics Anonymous or Alcoholics Anonymous (NA/AA) meetings per week, and submit to random drug testing. The court also ordered father to comply with mental health treatment plans and medication recommendations, participate in counseling or therapy addressing anger management and domestic violence, complete a drug and alcohol assessment and comply with all recommendations, attend a minimum of three NA/AA meetings per week, and submit to random drug testing.

*Six-Month Review Hearing*

In the six-month review report, filed on April 16, 2012, the social worker wrote: "[F]ather was incarcerated during the majority of this reporting period and therefore was unable to participate in most of his case plan services." However, mother had been sober for over four months, had completed an outpatient substance abuse treatment program, and was regularly attending both domestic violence support groups and individual therapy. Accordingly, Ivan was returned to his mother's care with family maintenance services.

*Section 387 Petition*

On September 13, 2012, the Agency filed a supplemental dependency petition (§ 387). Therein, it was alleged that mother and father had repeatedly been in contact since his release, in violation of a restraining order. Specifically, mother admitted

3

spending time with father a few days per week, when Ivan was present, and spending the night at father's home. She also admitted drinking alcohol with father when Ivan was present. The police had recently been called after father banged on mother's door, at 11:30 p.m., when Ivan was sleeping. Mother let father in and he yelled and cursed at her. Ivan was again detained and placed in foster care pending approval of placement with a maternal aunt and her husband.

In its jurisdiction/disposition report, filed on October 9, 2012, the Agency recommended that reunification services be terminated and a section 366.26 hearing be set. The report stated: "The mother and father placed Ivan at risk by engaging in drinking alcohol in the presence of Ivan and engaging in verbal arguments that could lead to further domestic violence. . . . [¶] . . . [¶] . . . [Mother] placed Ivan at additional risk by driving under the influence of alcohol on multiple occasions to be with the father. . . . [¶] . . . Although [mother] has shown the ability to complete services in the past [she] is clearly not able to distance herself from [father] and focus on creating a healthy stable environment for Ivan. Additionally, although [mother] completed services in the past and even graduated from a drug and alcohol program, the mother has not made changes to her life which would allow her to safely parent [Ivan]."

With respect to visitation, the report provided: "[Mother] is attentive and interactive with Ivan. [He] looks to [mother] for affection and comfort. [Mother] sings songs with Ivan and engages him in learning activities. [¶] . . . [Father also] plays with Ivan and is attentive to his needs. Ivan says 'Da Da' when he sees [father] and enjoys visiting with him."

At the uncontested jurisdiction and disposition hearing, the court sustained the section 387 petition, denied further reunification services to both parents because over 12 months of services had already been completed (§ 361.5, subd. (a)(1)(A)), and set a hearing under section 366.26. The court placed "the care, custody and control of the child with the Director of [the Agency] for supervision, planning and placement as he sees fit . . . ." Visitation with parents was reduced to once a month.

4

*Section 366.26 Hearing*

The Agency's section 366.26 report indicated that Ivan had transitioned to the maternal aunt's home in November. He was reported to be meeting developmental milestones, but also hitting, biting, and choking his cousins. It was also noted that father had been recently arrested after police responded to a report of two females involved in a physical fight at his home.[2] Father was found hiding in a closet with two rifles and a shotgun.

With respect to visitation, it was observed: "Ivan demonstrates happiness when he sees either parent. Ivan will run to each parent and displays affection. Both parents play interactively with Ivan by reading, singing, and playing with him. Both parents usually bring a snack for Ivan to enjoy during the visit. Visitation notes report that both parents verbally express that they miss and love Ivan." It was also reported that "Ivan has visited with [mother] at the [maternal aunt's] home and spends a majority of his visitation time clinging to [mother] and crying." Ivan was sad after mother's visits.

The social worker wrote: "Ivan is a cute and energetic toddler who does not appear to have an issue forming secure attachments to his caregivers. Ivan has benefited from his relationship with [mother] because it formed [his] foundation for building successive attachments in the future, but this initial attachment does not outweigh Ivan's need for a safe and stable home that will nurture his development for the next 16 years and beyond. [¶] . . . [¶] . . . There are no impediments to Ivan developing a secure and lasting attachment to his primary care givers." The Agency recommended adoption as the permanent plan and indicated that the maternal aunt was interested in adopting Ivan.

By the time of the February 20, 2013 section 366.26 hearing, adoption specialist Gusto Curtis testified that the maternal aunt had decided, "due to some mild behavior issues in the home they're no longer interested in being a permanency resource for Ivan." Nonetheless, Curtis opined: "I find [Ivan] to be very adoptable considering he's two years old. He has no serious medical issues. He has some mild behavioral issues, but it

_____

[2] Mother was one of the females involved in the fight.

5

does not appear that he has issues forming secure attachments to caregivers." Curtis also testified: "I'm not an attachment expert, but the child carries a secure attachment [to his parents.]"

Curtis reported that "[father's] sister" was being considered as a prospective adoptive parent.[3] However, in February 2013, she declined because she "[didn't] feel like she would be an appropriate adoptive parent for [Ivan]." Curtis testified: "I don't believe that there are [any other relatives available to adopt [Ivan]. The father's sister said she would check with that side of the family to see if there [were] any appropriate relatives, but again she expressed concern about any of the family being able to maintain the boundaries with the parents, and the fact that the parents would assume that a relative adopting the child would just give the child back to the parents. [¶] . . . [¶] . . . [W]e assessed the current relatives where the child is placed. Then we were pursuing assessment of the father's sister, but she's decided that she's . . . not a good candidate. And then nobody else has come forward in the last two years."

At the hearing's conclusion, the court found that "terminating the parental rights would not be detrimental and [Ivan] is a probable candidate for adoption; however [Ivan] is difficult to place at this time due to recent violent behavior. At this time there are no prospective adoptive parents." Concerned that Ivan might become a legal orphan if an anticipated adoption did not occur, the court referred Ivan for adoptive placement but did not terminate parental rights. Instead, the court selected adoption as the permanent placement goal and the matter was continued.[4] The court explained: "I don't think it is a normal thing for kids to bite other children. Certainly there may be some hitting, but apparently it's excessive at least for these former prospective adoptive parents. So it's obviously more [than] what would be normal, or it could be . . . that the parents are putting pressure on these persons because they can because they're family members that

---

[3] The record does not further identify the sister.

[4] The Agency filed an appeal from this order. That appeal was subsequently dismissed.

6

they know. And perhaps if this child is placed somewhere else they won't be able to put on that pressure and maybe you would see that the child will thrive somewhere else. But I don't think that I know enough . . . right now . . . given this recent change here."

In advance of the continued hearing, the Agency filed an updated section 366.26 report, which advised that Ivan had been placed, as of May 2013, in a nonrelative prospective adoptive home. The social worker wrote: "Ivan is thriving in his new placement. Ivan no longer exhibits the physically aggressive behaviors that he displayed in relative placement. Ivan is communicating verbally and he is more outgoing. . . . Ivan is building a loving relationship with the prospective adoptive parents and he refers to them as 'mommy and daddy.' . . . The [Agency] believes that Ivan's reported behaviors in the relative home were a reaction to the living environment. . . . [¶] . . . [¶] Ivan's likelihood of [a]doption is high. . . . [¶] . . . [¶] The prospective adoptive parents met Ivan in March 2013. They had a series of day visits with Ivan that transitioned to overnight visits in their home. Ivan was placed in their home in May 2013. . . . Ivan is observed to be affectionate and comfortable with the prospective adoptive parents and in the home. [¶] . . . [¶] The prospective [a]doptive parents are capable of meeting Ivan's needs and providing an appropriate and loving home environment for [him]."

With respect to monthly visitation, the social worker noted that one of mother's visits was cancelled when she failed to confirm, but that "[she] continues to be attentive and interactive with Ivan during visits." Ivan had become visibly upset when told he would not be seeing mother at a scheduled visit. Father had missed three of the last five visits. But, when he did visit, "he was attentive and interactive . . . ."

At the contested hearing, Curtis testified that Ivan had been placed with the prospective adoptive parents, as of May 3, 2013, but first began transition visits with them in March 2013. The prospective adoptive parents had seen no evidence of aggression. No evidence of developmental disability was found during a recent assessment.

Ivan's counsel and the Agency recommended that parental rights be terminated. Father's and mother's counsel both argued that the Agency had not met its burden of

7

showing that Ivan was adoptable and that, in any case, the beneficial relationship exception to termination had been proved.

The court concluded notice had been given as required by law, found that Ivan likely would be adopted, found "little to no evidence to support the beneficial relationship exception," and terminated mother's and father's parental rights. The court explained: "I'm sort of troubled that the parents did not make every visit. It's only once a month. And if you're really concerned about establishing that bond or keeping that bond that you say you have you'll make every visit. You'll reschedule. There are lots of days in a month where you can make that happen. And when what I hear is that mother missed two of the six and father missed three of the six, and they had whatever excuses they had, but there [were] no makeup sessions, that's troubling. So I don't believe the parents have even established that they had regular visits. [¶] . . . [A]ll I heard is that . . . [Ivan] calls his biological parents mommy and daddy. I also heard that he calls the prospective adoptive parents the same. So I don't see that, quote, unquote, beneficial relationship or that bond that has been talked about." Mother and father filed timely notices of appeal.

## II.    DISCUSSION

"Adoption, where possible, is the permanent plan preferred by the Legislature. [Citation.]" (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 573 (*Autumn H.*).) "[I]n order to terminate parental rights, the court need only make two findings: (1) that there is clear and convincing evidence that the minor will be adopted; and (2) that there has been a previous determination that reunification services shall be terminated. . . . '[T]he critical decision regarding parental rights will be made at the dispositional or review hearing, that is, that the minor cannot be returned home and that reunification efforts should not be pursued. In such cases, the decision to terminate parental rights will be relatively automatic if the minor is going to be adopted.' [Citation.]" (*Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 249–250; accord, § 366.26, subd. (c).)

Thus, at a section 366.26 hearing, "[a] finding . . . under Section 366.21 or 366.22, that the court has continued to remove the child from the custody of the parent . . . and has terminated reunification services, shall constitute a sufficient basis for termination of

8

parental rights. Under these circumstances, the court shall terminate parental rights unless . . . : [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to one or more of the following circumstances: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) "[T]he burden is on the party seeking to establish the existence of one of the section 366.26, subdivision (c)(1) exceptions to produce that evidence. [Citation.]" (*In re Megan S.* (2002) 104 Cal.App.4th 247, 252.) "Because a parent's claim to such an exception is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption." (*In re Scott B.* (2010) 188 Cal.App.4th 452, 469; accord, *In re Celine R*. (2003) 31 Cal.4th 45, 53.)

Mother and father do not challenge the juvenile court's finding that Ivan is likely to be adopted. Rather, they contend that the order terminating parental rights must be reversed because: (1) both the court and the Agency failed in their duty, under section 361.3, to give preference to relative placement; and (2) the juvenile court erred in finding the beneficial relationship exception inapplicable. Neither argument has merit.

A.     *Relative Placement*

First, father argues that both the court and Agency failed in their duty, under section 361.3, to give preference to relative placement when Ivan was moved from the maternal aunt's home.[5] He contends: "[H]ad the child been placed with the paternal

_____

5 Section 361.3 provides, in relevant part: "(a) In any case in which a child is removed from the physical custody of his or her parents pursuant to Section 361, *preferential consideration shall be given to a request* by a relative of the child for placement of the child with the relative . . . . In determining whether placement with a relative is appropriate, the county social worker and court shall consider, but shall not be limited to, consideration of the following factors: [¶] (1) The best interest of the child, including special physical, psychological, educational, medical, or emotional needs. [¶] (2) The wishes of the parent, the relative, and child, if appropriate. [¶] . . . [¶] (6) The nature and duration of the relationship between the child and the relative, and the relative's desire to care for, and to provide legal permanency for, the child if reunification

aunt, it is likely that one or both parents could have benefited from . . . more liberal

visitation conditions," giving them the opportunity to provide physical care, nourishment,

comfort, and affection to Ivan and be in a better position to establish the beneficial

relationship exception.  Mother joins in father's argument.  We review the juvenile

court's determinations regarding both placement and the admissibility of evidence for

abuse of discretion.  (*In re Cindy L.* (1997) 17 Cal.4th 15, 35; *In re Sabrina H.* (2007)

149 Cal.App.4th 1403, 1420.)

      1.     *Background*

Before the continued section 366.26 hearing, the Agency requested an offer of

proof from mother and father on any exceptions to adoptive placement they intended to

---

is unsuccessful. [¶] (7) The ability of the relative to do the following: [¶] (A) Provide a safe, secure, and stable environment for the child. [¶] (B) Exercise proper and effective care and control of the child. [¶] (C) Provide a home and the necessities of life for the child. [¶] (D) Protect the child from his or her parents. [¶] (E) Facilitate court-ordered reunification efforts with the parents. [¶] (F) Facilitate visitation with the child's other relatives. [¶] (G) Facilitate implementation of all elements of the case plan. [¶] (H) Provide legal permanence for the child if reunification fails. [¶] . . . [¶] . . . The court shall order the parent to disclose . . . known identifying information of any maternal or paternal relatives of the child.  This inquiry shall not be construed, however, to guarantee that the child will be placed with any person so identified.  The county social worker shall initially contact the relatives given preferential consideration for placement to determine if they desire the child to be placed with them. . . . [¶] . . . [¶] (c) For purposes of this section: [¶] (1) 'Preferential consideration' means that the relative seeking placement shall be the first placement to be considered and investigated. [¶] (2) 'Relative' means an adult who is related to the child by blood, adoption, or affinity within the fifth degree of kinship . . . .  However, only the following relatives shall be given preferential consideration for the placement of the child:  an adult who is a grandparent, aunt, uncle, or sibling. [¶] (d) *Subsequent to the hearing conducted pursuant to Section 358, whenever a new placement of the child must be made, consideration for placement shall again be given as described in this section to relatives who have not been found to be unsuitable and who will fulfill the child's reunification or permanent plan requirements.*  In addition to the factors described in subdivision (a), the county social worker shall consider whether the relative has established and maintained a relationship with the child. [¶] (e) If the court does not place the child with a relative who has been considered for placement pursuant to this section, the court shall state for the record the reasons placement with that relative was denied."  (Italics added.)

argue. Written offers of proof were to be submitted by August 9, 2013, but none were provided. At the hearing itself, mother's counsel and father's counsel requested an opportunity to cross-examine the social worker regarding adoptability and the beneficial relationship exception.

Father's counsel also indicated that another paternal aunt of Ivan, Rachel Z., who was present at the hearing, "[had] been attempting to be cleared by the [Agency] for placement so that family could have this child and they met nothing but frustration." However, father's counsel did not indicate he wanted to present any evidence on relative placement. He merely argued: "[Rachel Z.] has done everything asked of her, and finally just a week or so ago was given her first visit with the child . . . . I know I'm going to hear all kinds of objections, but I just think that nobody in the [Agency] thinks much of my client, and I think that that attitude has permeated this case, and they discriminated against him based on their belief that he's some kind of violent troublemaker."

After hearing argument, the court concluded: "It is true that there was [no offer of proof] provided in writing to the court or [the Agency] in any detail, but we have been told here in court what it will be about. . . . So while it is unfortunate that nothing was given in writing I don't think it creates too big of an issue . . . because they'll be cross-examining the [s]ocial worker, and that usually happens at every hearing. So I will allow the attorneys for the parents . . . to ask questions in that regard."

On cross-examination, Curtis testified that he was contacted by Rachel Z. "in April sometime [after] we started . . . transitioning Ivan to his current placement." Regarding Ivan's recent visit with Rachel Z., he explained: "The purpose of that visit was to connect [Rachel Z.] with prospective adoptive parents to maintain that paternal connection in the event that rights are terminated. [¶] . . . [¶] . . . We made it clear to [Rachel Z.] we have no intention of moving Ivan, but in good faith she wanted to be considered if something was to happen that we started to develop the assessment process." Thereafter, the following exchange occurred between father's counsel and Curtis:

"Q. Is it not true that [father] had contacted the [Agency] in various manners at least two months previous to that requesting that his paternal aunt be considered?

"[AGENCY'S COUNSEL]: I object as to relevance. Mr. Curtis is being offered for adoptability. It appears that [father's counsel] is asking questions about various assessments of relatives.

"[FATHER'S COUNSEL]: I do believe the law prefers that a child be adopted by a relative over a stranger whenever possible.

"THE COURT: All right. But how does that relate to the child's adoptability?

"[FATHER'S COUNSEL]: I think that relatives are more likely to want to deal with a child who has problems because they are blood relatives because they're family than strangers who adopt a child.

"THE COURT: Okay. I'm going to sustain the objection. I don't find it to be relevant."

2. *Analysis*

In his opening brief, father argues that both the court and Agency failed in their duty, under section 361.3, to give preference to any of the paternal aunts, Debbie Z., A.Z., or Rachel Z., with respect to Ivan's placement. However, in his reply brief, father narrows his argument to challenge only the Agency's and court's failure to consider placement with Rachel Z., in 2013, when Ivan was moved from the maternal aunt's home to a nonrelative. Father argues: "[H]ad the Agency properly considered the relative placement (1) the parents may have been able to argue the relative guardianship exception under [section] 366.26, subdivision (c)(1), and (2) visitation while the child was placed with the relative may have been more liberal in terms of amount, place, and . . . thus allowing the parents to better be able to establish the beneficial relationship exception under section 366.26, subd. (c)(1)(B)(i)." Mother joins in his argument.

We will assume without deciding that mother and father have standing to raise the issue on appeal. (See *In re K.C.* (2011) 52 Cal.4th 231, 236–239; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053–1054; *In re H.G.* (2006) 146 Cal.App.4th 1, 10; *Cesar V. v. Superior Court* (2001) 91 Cal.App.4th 1023, 1034–1035 (*Cesar V.*).)

12

However, we agree with the Agency that mother and father forfeited the relative placement argument because they did not raise it below. (*In re Sabrina H., supra,* 149 Cal.App.4th at p. 1419; *In re L. Y. L.* (2002) 101 Cal.App.4th 942, 956, fn. 8; *In re Daniel D.* (1994) 24 Cal.App.4th 1823, 1831.) There was a prior court order—the court's dispositional order—of which modification could have been sought, by way of a section 388 petition.[6] But no section 388 petition was ever filed. And, even when specifically asked what evidence would be presented at the contested section 366.26 hearing, neither father's nor mother's counsel raised the issue of relative placement. Father's counsel did pose questions regarding relative assessments to Curtis. But, when the Agency objected and the court inquired regarding relevance, father's counsel did not suggest the evidence was relevant, under section 361.3, subdivision (d), or otherwise present the argument he presses before this court. Father was not wrongly precluded from raising the issue as he suggests.

Father's argument is nonetheless without merit. Rachel Z. did not come forward until after reunification efforts had failed, adoption had been selected as the permanent placement goal, and Ivan had begun transitioning to placement with his prospective adoptive parents. "It is well-established that the relative placement preference found in section 361.3 does not apply after parental rights have been terminated and the child has been freed for adoption." (*Cesar V., supra,* 91 Cal.App.4th at p. 1031.) Furthermore, it is established that, "[w]hen reunification has failed . . . and the juvenile court has before it a proposed permanent plan for adoption, the only relative with a preference is a 'relative caretaker' (if there is one seeking to adopt) and the only preference is that defined by subdivision (k) of section 366.26 (that is, a preference to be first in line in the application

---

[6] Section 388, subdivision (a)(1), provides in relevant part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court."

process.)"[7]  (*In re Sarah S.* (1996) 43 Cal.App.4th 274, 285–286; see also *In re Lauren R.* (2007) 148 Cal.App.4th 841, 855 ["[t]here is no relative placement preference for adoption"].)  Because there is nothing in the record that suggests Rachel Z. was ever Ivan's caretaker, mother and father cannot show any abuse of discretion.[8]

B.      *Beneficial Relationship Exception*

Next, mother and father assert the juvenile court erred when it determined the beneficial relationship exception, under section 366.26, subdivision (c)(1)(B)(i), did not apply to preclude termination of parental rights.

Appellate courts have routinely applied the substantial evidence rule when reviewing a juvenile court's determination that an exception to termination did not apply. (See *In re B.D.* (2008) 159 Cal.App.4th 1218, 1235; *In re Dakota H.* (2005) 132 Cal.App.4th 212, 228; *In re L. Y. L., supra,* 101 Cal.App.4th at p. 947; *Autumn H., supra*, 27 Cal.App.4th at pp. 576–577.)  However, Division Three of this court has held that abuse of discretion is the proper standard.  (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1351 (*Jasmine D.*).)

---

[7] Section 366.26, subdivision (k), provides:  "Notwithstanding any other provision of law, the application of any person who, as a relative caretaker or foster parent, has cared for a dependent child for whom the court has approved a permanent plan for adoption, or who has been freed for adoption, shall be given preference with respect to that child over all other applications for adoptive placement if the agency making the placement determines that the child has substantial emotional ties to the relative caretaker or foster parent and removal from the relative caretaker or foster parent would be seriously detrimental to the child's emotional well-being."

[8] Father's reliance on *Cesar V., supra,* 91 Cal.App.4th 1023 is misplaced.  In *Cesar V.,* the father raised the placement issue at an earlier juncture—reunification services had been terminated and the children needed a temporary placement pending the section 366.26 hearing.  The social services agency was looking ahead to potential adoptive placement, but the children had not yet been referred for adoptive placement. (*Id.* at p. 1034.)  *Cesar V.* simply did not hold that section 361.3's relative placement preference would apply when, as here, the placement issue is raised, at the earliest, at a section 366.26 hearing, at which time adoption has already been selected as the permanent placement goal.

A third standard of review was recently articulated by the Sixth District, in *In re I.W.* (2009) 180 Cal.App.4th 1517, 1527–1528 (*I.W.*) and *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1317 (*Bailey J.*), and adopted by the Second District in *In re K.P.* (2012) 203 Cal.App.4th 614, 622.  The court undertakes a two prong analysis in determining the application of the beneficial relationship exception.  The first prong is whether the parent has maintained regular visitation and contact with the child.  The second is whether a sufficiently strong bond exists between the two, such that the child would suffer substantial detriment from its termination.  (*In re Aaliyah R.* (2006) 136 Cal.App.4th 437, 449–450.)  The Sixth District has said that the first determination is, because of its factual nature, properly reviewed for substantial evidence.  (*Bailey J.,* at p. 1314.)  But, the second prong analysis "is based on the facts but is not primarily a factual issue.  It is, instead, a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the importance of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption.  [Citation.]  Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies."  (*Id.* at p. 1315, italics omitted.)  We believe the result would be the same in this case under an abuse of discretion standard, a substantial evidence standard, or the standard articulated in *I.W.* and *Bailey J.*  The practical differences between the standards are "not significant," as all three give deference to the juvenile court's judgment.  (See *Jasmine D., supra*, 78 Cal.App.4th at p. 1351.)

Despite evidence of spotty visitation, we will assume that the first prong of section 366.26, subdivision (c)(1)(B)(i) has been met.  Nonetheless, we conclude that the juvenile court did not abuse its discretion, or make a finding unsupported by substantial evidence, in determining the exception inapplicable.  Ivan did not have a parental relationship with mother or father that necessitated preservation at the expense of depriving him of the permanency of adoption.

"Under section 366.26, subdivision (c)(1)(B)(i), parental rights cannot be terminated where the juvenile court 'finds a compelling reason for determining that

15

termination would be detrimental to the child' because '[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  The exception does not require proof the child has a 'primary attachment' to a parent or the parent has 'maintained day-to-day contact' with the child.  [Citation.] [¶] The exception's second prong requiring that 'the child would benefit from continuing the [parent-child] relationship' means that 'the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents.'  [Citation.]  The juvenile court 'balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer.'  [Citation.]  'If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated.'  [Citation.] [¶] 'The exception must be examined on a case-by-case basis, taking into account the many variables which affect a parent/child bond.  The age of the child, the portion of the child's life spent in the parent's custody, the "positive" or "negative" effect of interaction between parent and child, and the child's particular needs are some of the variables which logically affect a parent/child bond.'  [Citation.]"  (*In re C.B.* (2010) 190 Cal.App.4th 102, 123–124 [relying on, inter alia, *Autumn H., supra*, 27 Cal.App.4th at pp. 575–576].)

"While the exact nature of the kind of parent/child relationship which must exist to trigger the application of the statutory exception to terminating parental rights is not defined in the statute, the relationship must be such that the child would suffer detriment from its termination.  [Citation.]"  (*In re Angel B.* (2002) 97 Cal.App.4th 454, 467.)  "Interaction between natural parent and child will always confer some incidental benefit to the child.  The significant attachment from child to parent results from the adult's attention to the child's needs for physical care, nourishment, comfort, affection and stimulation.  [Citation.]  The relationship arises from day-to-day interaction, companionship and shared experiences.  [Citation.]  The exception applies only where the

16

court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent." (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) "[T]he *Autumn H.* language, while setting the hurdle high, does not set an impossible standard nor mandate day-to-day contact. . . . A strong and beneficial parent-child relationship might exist such that termination of parental rights would be detrimental to the child, particularly in the case of an older child, despite a lack of day-to-day contact and interaction." (*In re Casey D.* (1999) 70 Cal.App.4th 38, 51.) The exception "appl[ies] to situations where a dependent child benefits from a continuing parental relationship; not one . . . when a parent has [loving and] frequent contact with but does not stand in a parental role to the child." (*In re Beatrice M.* (1994) 29 Cal.App.4th 1411, 1420.)

There is evidence in the record of a positive attachment between Ivan and his parents. Ivan looked to mother and father for affection and comfort during visits. Both were attentive to Ivan's needs. Ivan called them "mommy" and "daddy." But at the time parental rights had been terminated, Ivan was less than three years old and had lived away from mother and father for approximately half his life. Mother and father had continued their volatile relationship despite the threat it posed to Ivan. And mother continued to abuse alcohol while caring for Ivan. On the other hand, the prospective adoptive parents could provide Ivan with consistency, stability, affection, and responsiveness to his emotional needs. Ivan progressed behaviorally in their care.

Mother and father rely on *In re S.B.* (2008) 164 Cal.App.4th 289, in which an order terminating parental rights was reversed because the juvenile court erroneously determined that the beneficial relationship exception did not apply. The social services agency in that case reported the father had " 'complied with every aspect of his case plan,' including maintaining his sobriety and consistently visiting S.B." (*Id.* at p. 293.) Nonetheless, the father's reunification services were terminated because the social worker opined that the father's physical and emotional health prevented him from reunifying with S.B. (*Ibid.*) The father had maintained supervised visits with S.B. three times a week. S.B. became upset when the visits ended and wanted to leave with the

father.  The father " 'demonstrate[d] empathy and the ability to put himself in his daughter's place to recognize her needs.' " (*Id.* at p. 294.)  A bonding study revealed that the bond between father and daughter was " 'fairly strong.' " (*Id.* at p. 295.)  During the observed visits, S.B. sat in the father's lap, played games, and colored.  "In the middle of coloring, S.B. [told the father], 'I love you,' and he responded in kind.  S.B. whispered and joked with [the father] and then spontaneously said, 'I wish I lived with you and Mommy and Nana.' " (*Ibid.*)  The juvenile court found that the beneficial relationship exception did not apply and terminated parental rights.  (*Id.* at p. 296.)

On appeal, the reviewing court concluded "there [was] no evidence to support the court's finding [the father] did not have some type of parental relationship with S.B." (*In re S.B., supra*, 164 Cal.App.4th at p. 298.)  The appellate court observed:  "As we recognized in *Autumn H.*, [a parental] relationship typically arises from day-to-day interaction, companionship and shared experiences, and may be continued or developed by consistent and regular visitation after the child has been removed from parental custody.  [Citation.]  The record here fully supports the conclusion [the father] continued the significant parent-child relationship despite the lack of day-to-day contact with S.B. after she was removed from his care.  [Citation.] [¶] . . . [¶] The [juvenile] court recognized that S.B. would benefit from continuing her relationship with [the father] and based its decision to terminate parental rights in part on the grandparents' willingness to allow [the father] to continue to visit S.B.  We do not believe a parent should be deprived of a legal relationship with his or her child on the basis of an unenforceable promise of future visitation by the child's prospective adoptive parents.  This situation is not, as the Agency contends, analogous to the sibling relationship exception under section 366.26, subdivision (c)(1)(B)(v), in which the court considers future sibling contact and visitation.  [Citation.]  Unlike the parent-child relationship, sibling relationships enjoy legal recognition after termination of parental rights.  [Citations.]" (*In re S.B.*, at pp. 299–300, italics omitted.)  Because "the only reasonable inference [was] that S.B. would be greatly harmed by the loss of her significant, positive relationship with [her

father]," the juvenile court erred when it found the beneficial relationship exception did not apply and terminated parental rights. (*Id.* at p. 301.)

This case is distinguishable, in that neither mother nor father successfully addressed the issues underlying the dependency. The facts of this case are more closely analogous to those presented in *Jasmine D., supra*, 78 Cal.App.4th 1339. In that case, the mother had visited consistently with Jasmine, who was three years old at the time of the hearing. During visits, mother was nurturing and provided the child with food, guidance, and discipline. However, the mother never progressed from supervised to unsupervised visits and had complied with virtually none of the requirements of her reunification plan. (*Id.* at pp. 1343–1344.) In considering whether the juvenile court had abused its discretion, in finding the beneficial relationship exception inapplicable, the reviewing court observed: "The exception . . . must be considered in view of the legislative preference for adoption when reunification efforts have failed. [Citation.] So viewed, the exception does not permit a parent who has failed to reunify with an adoptable child to derail an adoption merely by showing the child would derive some benefit from continuing a relationship maintained during periods of visitation with the parent. The [beneficial relationship] exception is not a mechanism for the parent to escape the consequences of having failed to reunify." (*Id.* at p. 1348.) The reviewing court concluded that the juvenile court had not abused its discretion, stating: "The benefit of a stable, permanent adoptive home for Jasmine clearly outweighed the benefit of a continued relationship with [the mother], who despite her successful visitation record had made no steps toward overcoming the problems leading to Jasmine's dependency . . . ." (*Id.* at pp. 1351–1352.)

The juvenile court's determination, that the benefits Ivan would receive from a continued relationship with either mother or father did not outweigh the benefits of permanence and stability Ivan would gain through adoption, is supported by substantial evidence and does not constitute an abuse of discretion. "[F]requent and loving contact" between a parent and child simply is not enough. (*In re Beatrice M., supra*, 29 Cal.App.4th at pp. 1418–1419.)

19

### III.    DISPOSITION

The juvenile court's order terminating parental rights is affirmed.

_____
Bruiniers, J.


We concur:


_____
Jones, P. J.


_____
Needham, J.